ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
NOV 20 2003
U.S. COURT OF FEDERAL CLAIMS

03-2699C

| | |
|---|---|
| NORTH STAR ALASKA HOUSING CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

## COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plaintiff North Star Alaska Housing Corporation alleges:

## JURISDICTION

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491, *et seq.* and 41 U.S.C. § 601, *et seq.*

## THE PARTIES

2. The plaintiff is North Star Alaska Housing Corporation ("North Star"), an Alaska corporation with its principal offices at 937 Harvard Avenue East, Seattle, Washington 98102.

3. The defendant is the United States of America, acting through officials representing the Secretary of the Army and the Chief of the Army Corps of Engineers (the "Government").

## NATURE OF THE ACTION

4. This is an action for breach of contract arising out of the lease agreement ("Lease," attached hereto as Exhibit A) between North Star and the Government for the 400-unit Army housing complex on Fort Wainwright, Alaska known as Birchwood Homes, which was entered into by virtue of the authority of 10 U.S.C. § 2828, as amended by Section 801 of Public

Law 98-115 ("Section 801"). Section 801 introduced privatization into the military housing market, and represents an effort by Congress to ensure that soldiers and their families receive quality, safe, affordable, and convenient housing options that had been lacking when military housing was exclusively Government-run.

5. As set forth below, the Government has breached its Lease with North Star and has acted in bad faith in administering the Lease.

6. Further, pursuant to 28 U.S.C. § 2201-02, North Star seeks a declaration as to the Government's contractual obligations pursuant to the Lease.

7. Prerequisite jurisdictional matters with respect to the filing of this Complaint and with respect to the claims asserted in this Complaint have been met.

## BACKGROUND

8. In February 1985, the United States Army Corps of Engineers (hereafter "COE") issued Request for Proposals (hereinafter "RFP") No. DAC85-85-R-0019 for Design and Construction of 400 units of Section 801 Build-to-Lease On-Base Family Housing for Fort Wainwright, Alaska.

9. North Star submitted proposals in a timely manner for the July 5, 1985 deadline for receipt of initial proposals and for the December 16, 1985 deadline for receipt of best and final offers. The contract was awarded to North Star on December 31, 1985. The contract documents include the following:

(a) Contract No. DACA85-1-86-11, the Outlease of the Government property on Fort Wainwright to North Star for a term of thirty-two (32) years, beginning on June 27, 1986 and ending on June 26, 2018, entered into under the authority of 10 U.S.C. § 2667;

(b) Contract No. DACA85-9-86-27, the Agreement to Lease the same Government property from North Star with residential buildings and other improvements back to the Government, which was effective on June 17, 1986, under the authority of 10 U.S.C. § 2828, as amended by Section 801 of P.L. 98-115;

(c) Contract No. DACA85-87-74, the Interim Lease for the residential units for the period of phased occupancy as the units became ready for habitation until the COE accepted all of the units entered into between COE and North Star on January 24, 1987 and terminating upon execution of the Lease;

(d) Contract No. DACA085-5-88-17, the Lease between COE and North Star for the land and improvements for a term of nineteen (19) years and six (6) months executed on November 6, 1987; and

(e) a Memorandum of Understanding (hereafter "MOU") which sets forth the conditions agreed to by North Star and the COE for acceptance of units during the phased occupancy period which was effective December 22, 1986.

10. Pursuant to the Lease, the COE is renting all 400 units for nineteen years and six months. The COE pays "shelter rent" for the use of the housing. This is an amount determined by North Star and submitted as a part of its price proposal to provide for return on and of the capital investment required for construction. The COE is contracting with North Star for a variety of maintenance and operational services. Payment for these services is called

"maintenance rent." The COE is also obligated to pay the rates and charges for utilities used by the Government during the fall term of the Lease.

## FACTUAL ALLEGATIONS

### I. Carpet Replacement in Unit 884

11. The Government directed North Star to replace the upstairs hallway carpet in Unit 884 which was caused by the occupants.

12. North Star asserts that the damage to the carpet – staining and non-pleasing appearance – could be corrected by cleaning the carpet. North Star raised its concerns about the lack of necessity of replacing the carpet to the Contracting Officer's Representative ("COR"), but to no avail. Accordingly, North Star conducted the replacement under protest.

13. The upstairs hallway carpet that North Star replaced was a blue color that, upon information and belief, was no longer available. North Star replaced the carpet with its available carpet, which was brown in color. North Star turned the unit back to the Government.

14. The Government then ordered North Star to, at its own expense, either replace the new brown carpet with a matching blue carpet or replace undamaged stairs and downstairs carpet to match the brown carpet used in the upstairs hallway.

15. Section C.1.(s) of the Lease Maintenance Annex provides with respect to damages caused by occupants that "[d]amages to a housing unit or to other improvements within the project which are beyond normal wear and tear and are caused by the Government or an occupant . . . shall be repaired by the Developer. The cost of such repairs shall be billed to the Government." The replacement at issue in Unit 884 stems from occupant damage to the upstairs hallway carpet.

16. Section E of the Lease Maintenance Annex provides with respect to standards for maintenance of structures that the level of maintenance shall assure a "pleasing appearance" and that "[a]ll replacements shall match existing dimensions, material, quality of work, finish, color, and design." Section E.2.(b)(6) states that "[a]ny complete or partial replacement of carpeting shall be in kind." Prior to ordering that non-damaged carpet in unit 884 be replaced because it allegedly did not match, the Government had directed installation of the new brown carpet in other units without demanding replacement of blue carpet elsewhere in the unit.

17. On October 22, 2003, North Star requested a contracting officer's decision on the Government's position on replacing carpet in good condition in undamaged areas of a unit when occupant damage caused replacement of carpet in the first place. While awaiting a contracting officer's decision, and in order to avoid holding up the unit, North Star replaced the stairs and downstairs carpet to match the carpet replaced due to occupant damage.

18. On November 20, 2002, the Contracting Officer issued a decision that North Star must, at its expense, either replace the occupant damaged carpet with matching blue carpet or replace the undamaged adjacent carpet with the brown carpet used to replace the damaged carpet.

19. When a similar issue of replacement item matching arose with respect to countertop replacement, the contracting officer issued a decision on January 31, 2003 that "all countertop surfaces in a room must be viewed as a whole, and therefore must match to meet lease requirements. If a portion of a countertop in a room has been damaged by the occupant, and the damaged portion cannot be repaired to match the existing countertop, then the Government is financially responsible for the replacement of as much countertop as necessary to ensure that all countertop in the room matches. Similarly, if fair wear and tear requires

replacement of only a portion of countertop and no color-matched material is available to make the repair, North Star would be responsible for replacement of as much countertop in the same room as necessary to ensure all of the countertop in the room matches and meets the pleasing appearance requirements of Sec. E of the lease."

**II. Interior Painting in Unit 704**

20. In June, 2002, North Star accomplished a full paint of the interior of unit 704.

21. In November, 2002, the Government ordered a full paint of unit 704 even though the unit had recently been painted and the paint was in good condition.

22. North Star protested the Government's direction to paint unit 704 and performed the painting under protest.

23. Prior to ordering that North Star paint the unit, the Government, in writing, stated that it and North Star were in agreement that the unit was fully painted inside in June 2002 and did not require additional painting at that time.

24. Section E.8.(d) of the Lease states that:

> Complete interior painting will be accomplished as required in conjunction with the change of occupancy work. Complete interior painting will be accomplished at the first change of occupancy occurring subsequent to the 3rd, 6th, 9th, 12th, 15th, and 18th years of the lease agreement. Complete or partial interior painting during all other changes of occupancy, except where required in connection with maintenance and repair, will be at the discretion of the Developer. . . .

The 18th year of the Lease agreement occurred on November 6, 2002.

25. North Star's position is that the only reasonable read of the interior painting provision is to require complete interior paints at the first change of occupancy subsequent to the years identified in the Lease only if a complete interior paint had not been accomplished in the course of change of occupancy work in the preceding three year period.

26. Contrary to its prior interpretation of the Lease, the Government now interprets this provision to require a full interior painting at the first change of occupancy after November 6, 2002 regardless of the date the last full interior painting or condition of the unit.

27. On November 21, 2002, North Star requested a contracting officer's decision with respect to the financial responsibility for the complete painting of unit 704.

28. On January 13, 2003, the contracting officer issued a decision that North Star was required to accomplish a full interior paint of unit 704 at its expense regardless of the fact that it had been painted in June, 2002 and was in good condition.

**III. Carpet and Vinyl Replacement in Unit 833**

29. The Government ordered replacement of all the carpet and the laundry room vinyl in unit 833 at North Star's expense allegedly due to fair wear and tear.

30. North Star asserts that these replacements were necessitated by occupant damage, not fair wear and tear, pursuant to Section C.1.(s) of the Lease.

31. North Star conducted the replacement under protest.

32. The Government failed to issue work authorizations for replacement of occupant-damaged carpet identified in this unit during previous changes of occupancy.

33. The last occupant had spilled bleach throughout the carpet and had caused easily repairable frays, seam runs, or unraveling.

34. Upon information and belief, the carpet would have been in good condition but for occupant abuse and neglect.

35. The appearance of the vinyl was attributable to occupant-caused stains and occupant neglect from lack of cleaning and waxing

36. The small crack in the vinyl could have easily been repaired without replacement.

37. On December 16, 2002, North Star requested a contracting officer's decision with regard to the financial responsibility for replacement of this carpet and vinyl.

38. On February 14, 2003, the contracting officer issued a decision that the vinyl required replacement at North Star's expense due to cracks and that there was no observed evidence of staining reflective of occupant damage, and that the carpet required replacement due to its age and worn-out condition. The decision acknowledged that there were bleach stains that would normally be the Government's responsibility, but held that the carpet had fully depreciated and was North Star's full financial responsibility.

## IV. Reimbursement for Light Fixture in Unit 1029

39. One of two matching kitchen light fixtures in unit 1029 required replacement due to occupant damage. Accordingly, North Star replaced the damaged light fixture and billed the Government the cost of replacement: $189.50 for materials and labor.

40. The Government contended that this replacement was an "upgrade" and agreed to pay only $107.69 of the cost of replacing the occupant-damaged light fixture. It is North Star's position that the cost of replacing the occupant-damaged light fixture was not an "upgrade", but rather the cost of replacing the fixture rose in the approximately 16 years since the Lease was signed – and such upward adjustment is contemplated in Section C.1(t) of the Lease.

41. On March 25, 2003, North Star requested a contracting officer's decision regarding the Government's obligation to reimburse North Star for the full replacement cost of this light fixture.

42. On May 22, 2003, the contracting officer issued a decision that North Star was responsible for the $81.81 cost difference between the original light fixture and the replacement fixture even though replacement of the fixture was necessitated by occupant damage.

## V. Corrections of Vinyl of Units 1090 and 1111

43. The Government ordered replacement of vinyl at North Star's expense in units 1090 and 1111 when wholly minor seams could easily been corrected by repair.

44. The vinyl was not identified at the pre-termination or termination inspections as in need of correction.

45. Section C.1.(s) of the Lease states that damages beyond normal wear and tear which are caused by the Government or an occupant and are not "corrected" by the Government or occupant shall be "repaired" by the Developer and that "repair of damages" not attributable to the Government or an occupant shall be accomplished by the Developer at no cost to the Government. Section E.2(b)(4) of the Lease states that floor covering should be "maintained free of cracks, chips, and torn or excessively worn material to provide floor coverings that are usable and have a pleasing appearance." In addition, Section D.7(a) of the Lease states that work "identified by the Developer or Government during the pre-termination and final inspection terminations which is required to make a unit ready for the next occupant shall be accomplished while that unit is vacant." No other inspections for the determination of work to be performed during change of occupancy are specified under the Lease.

46. North Star conducted repairs which rendered the vinyl in these units free of cracks, safe, and of a pleasing appearance in accordance with Section E of the Lease. However, the Government continued to demand replacement of the vinyl. North Star raised its concerns about the need to replace the vinyl in these units with the COR, but to no avail. Accordingly, North Star conducted the replacement under protest.

47. On March 25, 2003, North Star requested a contracting officer's decision respecting whether North Star satisfactorily corrected the vinyl.

48. On May 23, 2003, the contracting officer issued a decision that with respect to unit 1090, vinyl required replacement due to the presence of cracks and that the Government had unfettered authority to determine that the repairs conducted by North Star were unsatisfactory, and with respect to unit 1111 that because vinyl replacement had not been work authorized, North Star was responsible for the cost of vinyl replacement there.

**VI. Vinyl Replacement in Unit 633**

49. The Government ordered full replacement of vinyl at North Star's expense in unit 633 due to the alleged "non-pleasing appearance" of the vinyl. The vinyl's "non-pleasing appearance" was due to occupant damage and not fair wear and tear. The COR stated that the vinyl was "unsightly and showing its age," that the "overriding reason for replacement is its non-pleasing appearance," and that "replacement is at North Star's expense."

50. Pursuant to Section C.3(a)(4) of the Lease, occupants are responsible for cleaning, waxing, and polishing floors. Moreover, manufacturer instructions for proper vinyl maintenance were provided to the Government at the inception of the lease, and thereafter. The Government has failed to ensure that the vinyl flooring is properly maintained, which would keep it in good condition with a pleasing appearance, as it is maintenance, not age, which primarily affects the appearance of vinyl.

51. On June 13, 2003, North Star requested a contracting officer's decision as to whether vinyl with a non-pleasing appearance due to occupant neglect/abuse is the financial responsibility of North Star or the Government.

52. On August 4 2003, the contracting officer issued a decision that the vinyl in Unit 633 had cracks, stains, and a non-pleasing appearance which required replacement due to normal wear and tear; that there was "no evidence that the occupant abused the flooring through lack of

cleaning"; and that North Star would be responsible for the cost of replacement. The contracting officer also stated that the non-pleasing appearance was "from normal wear after 15 years of use."

## VII. List of Repair Costs

53. As it is required to do under the Lease, North Star submitted a 2003 List of Repair Costs to the Government. The Government responded by providing North Star with another list of repair costs which it designated as "approved" which contained inaccurate and outdated information.

54. The Government imposed a requirement that North Star provide separate materials and labor invoices for items included in the List of Repair Costs provided by North Star.

55. North Star objected to the Government's responses to North Star's provision of the 2003 List of Repair Costs, but to no avail.

56. Pursuant to Section C.1.(t) of the Lease, North Star shall, with the approval of the Government establish a list of repair costs to establish the normal maximum amounts to be charged. The Government has refused to approve items on the List of Repair Costs submitted by North Star which are reasonable and based on the costs of materials and labor time, and has imposed an extra-contractual requirement -- that North Star provide separate invoices for items on the List of Repair Costs -- which defeats the very purpose of the List of Repair Costs.

57. On July 22, 2003, North Star requested a contracting officer's decision on the Government's failure to approve the 2003 List of Repair Costs submitted by North Star when such List of Repair Costs was supported by documentation, and the Government's imposition of a requirement that North Star provide invoices for items on the List of Repair Costs.

58. By letter dated September 18, 2003, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the claim respecting the List of Repair Costs implicated allegations already pending before the Court of Federal Claims. North Star disagrees that these issues are already pending before the Court, and thus deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

**VIII. Authority to Order Disputed Work**

59. The Birchwood Housing Manager has engaged in the practice of directing North Star to perform disputed work. However, pursuant to both the Lease and prior directives from the former Contracting Officer, for disputes valued at less than $10,000 only the Contracting Officer or COR have the authority to direct North Star to perform disputed work, and for disputes valued at $10,000.00 or more, only the Contracting Officer has the authority to direct North Star to perform disputed work.

60. Under Section C.2.(b) of the Lease, which sets forth the Housing Manager's responsibilities, ordering disputed work is not among the enumerated responsibilities. Moreover, in a memorandum dated June 13, 2000, then-Contracting Officer Dennis Klein expressly authorized *the COR* to direct North Star "in cases where the contractor disputes whether such work is contractually required [hereinafter referred to as "disputed work"] and the work is estimated to cost no more than ten thousand dollars ($10,000.00)."

61. On July 31, 2003, North Star requested a contracting officer's Decision on the Birchwood Housing Manager's position that she has the authority to direct disputed work.

62. The contracting officer issued a decision on September 29, 2003 that under Sections C.2(c) and D.7(b) of the Lease, the Government Housing Office is responsible for

identification of work requirements, and that disputed work must be accomplished in accordance with the direction of the Housing Officer. The contracting officer found that the COR's responsibility is limited to determining – for disputes of $10,000 or less – whether work required of North Star by the Government Housing Office is required due to normal wear and tear, and thus the financial responsibility of North Star, or due to occupant damage, and the financial responsibility of the Government.

**IX. Gutter Downspout Repairs in Unit 638**

63. Although the gutter downspout of the garage of unit 638 was crushed and cracked, the Government stated that such damage was the result of fair wear and tear and should be corrected at North Star's expense. North Star wrote to the COR seeking his determination as to financial responsibility for replacement, but he responded that because the Housing Manager had directed replacement he was unable to make any such determination.

64. The type of damage to the gutter downspout was clearly occupant-caused. Pursuant to Section C.1.(s) of the Lease, correction of such damage is at the Government's expense. Moreover, pursuant to Section D.7.(b)(3) of the Lease, the Government is required to issue a work authorization to North Star for the correction of occupant-caused damages.

65. On August 11, 2003, North Star requested a contracting officer's decision on the Government's obligation to issue a work authorization for the correction of the damage to the gutter downspout in unit 638.

66. By letter dated September 22, 2003, the contracting officer declined to issue a Contracting Officer's decision on the correction of the gutter downspout in unit 638, because he contended that such a decision would implicate allegations already pending before the Court of

Federal Claims. However, the issue of which party bears responsibility for correcting the gutter downspout in unit 638 is not already pending before the Court.

## X. Re-Painting of Unit 961 and Use of Black Light to Inspect Painting

67. On July 8, 2003, the Government provided North Star with a list of "discrepancies noted at return inspection" of unit 961 which included painting of the bathrooms. The Government directed North Star to repaint the bathrooms in Unit 961 even though the bathrooms had been fully repainted during change of occupancy maintenance on that unit. North Star's maintenance professionals inspected the premises and found that the bathrooms were of pleasing appearance and had been painted in a complete and professional manner.

68. Section E of the Lease sets forth the standard for maintenance of structures as maintenance to a standard that prevents deterioration beyond that which results from normal wear and tear, corrects deficiencies in a timely manner, and assures that all structures are free of missing components or defects which would affect the safety, pleasing appearance or habitability of units. "Pleasing appearance" is defined as an appearance similar to the original finished appearance with only minor, non-objectionable deterioration resulting from normal use.

69. North Star sought the COR's opinion on the condition of the bathrooms in Unit 961. The COR responded that, by using a black light to inspect the bathroom, he detected imperfections in the painting.

70. On August 11, 2003, North Star requested a contracting officer's decision with respect to the financial responsibility for repainting the bathrooms in Unit 961, and also with respect to whether use of a black light was an appropriate means of evaluating the appearance of a unit.

71. The contracting officer issued a decision on September 29, 2003 that the Government is not limited in its method of determining the adequacy of repairs so long as that method is reasonable, and that use of a black light to determine adequacy of repairs is reasonable. In addition, the contracting officer held North Star financially responsible for the repainting of the bathroom in Unit 961.

**XI. Countertop and Carpet in Unit 961**

72. On July 8, 2003, the Government provided North Star with a list of "discrepancies noted at return inspection" of unit 961. The list notes master bathroom countertop stains, caused by occupant damage, and states that replacement will be accomplished at a future change of occupancy. In addition, other occupant caused damages have been omitted from the list. For example, the kitchen countertop of unit 961 is chipping due to occupant-caused burn blisters near the stove. The list also does not call for replacement of carpet in the downstairs hall which contains an occupant-caused burn.

73. On July 10, 2003, North Star wrote to the COR respecting the Government's double standard of not authorizing repairs of occupant-caused damages for which the Government is financially responsible, but requiring replacement at North Star's expense items due to alleged fair wear and tear for units in much better condition that unit 961. North Star requested that the COR make a determination regarding the financial responsibility for replacement of the unsightly occupant damages in Unit 961. The COR declined to do so.

74. Section E of the Lease sets forth standards of maintenance which are to be followed regardless of whether North Star or the Government bears the cost of making the unit meet such standards.

75. On August 11, 2003, North Star requested a contracting officer's decision on the need for countertop and carpet replacement in unit 961 and the financial responsibility with respect thereto. North Star's request included a decision regarding the Government's obligation to authorize the correction of all occupant damage between occupancies.

76. By letter dated September 22, 2003, the contracting officer declined to issue a decision on these issues because he determined that they involved allegations pending before the Court. However, the issue of the need for replacement of countertop and carpet replacement in unit 961 is not before this Court. North Star disagrees that this issue is already pending before the Court, and thus deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

**XII. Cleaning of Units**

77. The Government has taken the position that North Star must accomplish cleaning of Birchwood units as part of its current Lease agreement, and has directed North Star to clean units.

78. Cleaning is not a contractual responsibility of North Star under the Lease. From the inception of the Lease through this dispute, cleaning has been accomplished between a separate agreement between the Government and a cleaning contractor, CDC Tag. Indeed, in 1999, the Government directed North Star to remove cleaning from the List of Repair Costs because North Star did not perform cleaning services at Birchwood. Moreover, the parties' attempted settlement of Case No. 98-168C in 2000 gave North Star the *opportunity* to undertake responsibility at Birchwood, which North Star ultimately declined.

79. As an accommodation to the Government and to avoid any downtime penalty, and because cleaning is not subject to the Lease, when the Government directs that North Star clean a

unit, North Star has arranged to subcontract the cleaning and has billed the Government the subcontract costs plus the cost of supervision, *actual* overhead, and 10% margin. The Government, however, only work authorizes the subcontract costs plus 10% overhead.

80. On August 26, 2003, North Star requested a contracting officer's decision that cleaning is not North Star's responsibility under the Lease, and that if North Star is to accomplish the cleaning of units the Government must either pay North Star the costs of subcontracted cleaning, plus North Star's supervision costs incurred arranging such cleaning, plus actual overhead and 10% margin, or must make separate contractual arrangements to have the units cleaned.

81. On October 20, 2003, the contracting officer issued a decision that the Government has the authority to issue units to North Star to cleaning. The contracting officer further stated that such cleaning shall be accomplished according to the List of Repair Costs or, if cleaning is not part of such list, North Star shall be paid under the Lease the cost of the subcontractor plus only 10% overhead and 10% profit.

## COUNT I

## BREACH OF CONTRACT

82. Paragraphs 1 through 81 above are incorporated by reference as if fully set forth herein.

83. The Government has engaged in multiple breaches of its Lease with North Star.

84. As a direct and proximate result of the Government's breaches, North Star has suffered damages in an amount to be determined at trial.

## COUNT II

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

85. Paragraphs 1 though 84 above are incorporated by reference as if fully set forth herein.

86. The Lease and other contract documents carry with them the obligation of the parties to conduct their affairs in good faith and to deal fairly with each other.

87. The Government's conduct under the Lease, set forth above, is in direct violation of its duty of good faith and fair dealing, including but not limited to its conduct of deducting rent from North Star as a result of the aforementioned contract disputes.

88. The Government's conduct represents an intentional course of conduct having as its principal intent the intentional infliction of injury to North Star, causing damages to North Star in an amount to be determined at trial.

## COUNT III

## DECLARATORY JUDGMENT

89. Paragraphs 1 though 88 above are incorporated by reference as if fully set forth herein.

90. There is a substantial controversy between the parties having adverse legal interests and/or sufficient immediacy to warrant issuance of a declaratory judgment.

91. Based upon the actions and inactions of the Government, North Star requests that this court find and declare that North Star's interpretations of the Contract, set forth above, are correct.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff respectfully demands judgment against defendant as follows:

(A) Damages in an amount to be determined at trial.

(B) A Declaration that plaintiff's interpretations of the Lease relative to this complaint are correct;

(C) Appropriate interest, attorneys' fees, and costs; and

(D) Such other and further relief as the court deems just and proper.

Dated: November 20, 2003.

Respectfully Submitted,

PAUL W. KILLIAN
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave. N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's Complaint for Damages and Declaratory Relief was served first-class U.S. mail, postage pre-paid, and via hand delivery, this 20th day of November, 2003, on:

Donald E. Kinner, Esq.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Attorney for Defendant

Paul W. Killian